# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| FREDERICK ROZO, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>ESSILORLUXOTTICA S.A., LUXOTTICA GROUP, S.P.A., ESSILOR INTERNATIONAL SAS, ESSILORLUXOTTICA USA INC., LUXOTTICA U.S. HOLDINGS CORP., ESSILOR OF AMERICA HOLDING COMPANY, INC., LUXOTTICA OF AMERICA, INC., ESSILOR OF AMERICA INC., AND EYEMED VISION CARE, LLC,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>Demand for Jury |

Plaintiff Frederick Rozo ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., Essilor of America Inc., and EyeMed Vision Care LLC (collectively "EssilorLuxottica" unless delineated otherwise). Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

## NATURE OF THE ACTION

1.    This is an action brought under Sections 1 and 2 of the federal Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, to restrain anticompetitive conduct by EssilorLuxottica, the largest Premium-Branded Eyewear company in the world, and to remedy the harms of its anticompetitive scheme.

2.      In 2018 Luxottica Group S.p.A., the global eyewear frame conglomerate founded in 1961 by Leonardo Del Vecchio, merged with Essilor International S.A., the global leader in optical lenses, creating EssilorLuxottica S.A. Luxottica's 2018 merger with Essilor fulfilled Del Vecchio's[1] long-held ambition to dominate and monopolize every aspect of the Premium-Branded Eyewear Market, as defined herein. In 2022 alone, Premium-Branded Eyewear in the United States generated approximately $7.9 billion in revenue, of which EssilorLuxottica captured at least 80 percent. EssilorLuxottica's staggering market share, and revenue generated from Premium-Branded Eyewear, is the direct result of EssilorLuxottica's greatest achievement: its successful implementation of a multi-dimensional anticompetitive scheme to preserve, extend, and expand its monopoly in Premium-Branded Eyewear by eliminating competition and controlling and maintaining the retail price of the most popular brands of Premium-Branded Eyewear in the United States at artificially high rates far exceeding competitive levels.

3.      EssilorLuxottica has abused, and continues to abuse, its monopoly power by preventing, delaying, excluding, or otherwise restraining or suppressing retail competition in the Premium-Branded Eyewear Market, in the United States to impose supra-competitive prices in the Premium-Branded Eyewear Market. Plaintiff and the Class have paid, and continue to pay, supra-competitive prices for Premium-Branded Eyewear purchased directly from EssilorLuxottica.

4.      From at least January 1, 2010 through the present, Plaintiff and the Class suffered damages in the form of overcharges on their purchases of Premium-Branded Eyewear directly caused by EssilorLuxottica's antitrust violations for which they seek redress.

5.      EssilorLuxottica controls over 80 percent of the Premium-Branded Eyewear Market in the United States, which it obtained and maintained via at least the following anticompetitive means: aggressively acquiring vertical and horizontal competitors, entering into exclusive licensing agreements with Fashion Houses, as defined herein, consummating anticompetitive sales agreements with Premium-Branded Eyewear Competitors, as defined herein,

---

[1] Del Vecchio died on June 27, 2022.

and entering into anticompetitive distribution agreements with third party sellers. From 1990 to the present, first Luxottica, then EssilorLuxottica, placed itself at the center of Premium-Branded Eyewear retail through a series of acquisitions of some of the most well-known Premium-Branded Eyewear brands including, *inter alia*, Ray-Ban, Oakley, Sferoflex, Vogue Eyewear, Persol, Arnette, Oliver Peoples, Alain Mikli, Starck Biotech Paris, Costa Del Mar, and Barberini (EssilorLuxottica's "Proprietary Brands"), and the largest eyewear retailers in the United States including, *inter alia*, LensCrafters, Pearle Vision, Target Optical, Vision Source, and Sunglass Hut.

6.      At the same time, Luxottica entered into a series of ultra-long-term, exclusive licensing agreements with Fashion Houses that include, *inter alia*, Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Giorgi Armani, Jimmy Choo, Michael Kors, Miu, Native, Polo by Ralph Lauren, Prada, Ralph Lauren, Swarovski, Tiffany & Co., Tory Burch, and Versace ("Licensed Fashion House Brands") granting EssilorLuxottica the exclusive right to produce, manufacture, and distribute Fashion House Premium-Branded Eyewear, under the brands and trademarks of the Fashion Houses. Under these exclusive agreements, EssilorLuxottica controls distribution, which includes the wholesaling of the Licensed Fashion House Brands to third-party retailers, back to the Fashion Houses themselves, and to its own direct-to-consumer retail sale of those famous brands through EssilorLuxottica-owned retail outlets. The exclusive licenses also give EssilorLuxottica control over retail pricing of the Fashion House products and the Fashion Houses agree to permit EssilorLuxottica to establish retail price floors, far above competitive levels, through its physical and online retail outlet stores that the Fashion Houses cannot undermine.

7.      EssilorLuxottica used similar pricing authority, or price coordination clauses, in its anticompetitive sales agreements with competing manufacturers, including, *inter alia*, Kering Eyewear S.p.A., for the sale of, *inter alia*, Balenciaga, Chloe, Gucci, Maui Jim, and Saint Laurent Premium-Branded Eyewear, Marcolin S.p.A., for the sale of, *inter alia*, Tom Ford Premium-Branded Eyewear, Christian Dior SE, for the sale of, *inter alia*, Dior Premium-Branded Eyewear,

and LVHM and Thélios S.p.A, for the sale of, *inter alia*, Celine and Fendi Premium-Branded Eyewear ("Premium-Branded Eyewear Competitors"). Under these anticompetitive sales agreements, Premium-Branded Eyewear Competitors and third-party retailers agree to permit EssilorLuxottica to establish retail price floors, far above competitive levels, through its physical and online retail outlet stores that the Premium-Branded Eyewear Competitors and third-party retailers cannot undermine.

8.     Finally, EssilorLuxottica used similar pricing authority, or price coordination clauses, in its anticompetitive distribution agreements with third-party sellers for the retail sale of EssilorLuxottica's Proprietary Brands and Licensed Fashion House Brands. Under these anticompetitive distribution agreements, third-party retailers agree to adhere to EssilorLuxottica retail pricing decisions, which are far above competitive levels, that third-party retailers cannot undermine.

9.     Below is a graph illustrating EssilorLuxottica's web of anticompetitive agreements:

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /



10.     The effect of EssilorLuxottica's monopolistic web is that it ensures that the supra-competitive retail pricing for Premium-Branded Eyewear sold directly to consumers at EssilorLuxottica's retail stores is protected. Premium-Branded Eyewear sold directly by the Fashion Houses, Premium-Branded Eyewear Competitors, and third-party sellers, is not permitted to be sold at prices lower than the same Premium-Branded Eyewear sold at, for example, EssilorLuxottica's LensCrafters, Pearle Vision, and Sunglass Hut.

11.     As such, EssilorLuxottica can maintain its supra-competitive retail pricing in the Premium-Branded Eyewear Market because it has eliminated retail price competition.

12.     As a direct and proximate result of EssilorLuxottica's multi-dimensional anticompetitive scheme, Plaintiff and the Class have been deprived of a meaningful choice to purchase Premium-Branded Eyewear less-expensively and have paid supra-competitive prices for

those products. Through its unlawful conduct, EssilorLuxottica has insulated its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors from price competition, allowing EssilorLuxottica to charge artificially high prices in the Premium-Branded Eyewear Market that has been, and continues to be, higher than it would be, but for its monopolization, restraint of trade, price coordination, and unlawful conduct.

13.     Plaintiff and the Class paid supra-competitive prices to EssilorLuxottica for the Premium-Branded Eyewear they purchased at EssilorLuxottica-owned and operated physical and online retail outlets which include, *inter alia*, Oakley stores, Ray-Ban stores, LensCrafters, Pearle Vision, Sunglass Hut, Target Optical, For Eyes stores, Oliver Peoples stores, Persol stores, Alain Mikli stores, Vision Source optometric offices, eyebuydirect.com, framesdirect.com, glasses.com, oakley.com, ray-ban.com, sunglesshut.com, lenscrafters.com, pearlevision.com, targetoptical.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, or arnette.com. Plaintiff's and the Class's payment of supra-competitive prices for Premium-Branded Eyewear directly to EssilorLuxottica materially and proximately caused their injury.

14.     As a measure and reflection of the success of EssilorLuxottica's anticompetitive scheme, it has been able to sustain 1,000–5,000 percent retail markups on Premium-Branded Eyewear without losing, but in fact increasing, market share and operating margins.

15.     Plaintiff and the Class are threatened with impending future harm in the form of additional overcharges if EssilorLuxottica's anticompetitive conduct is not enjoined.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C §§ 1331 and 1337, as this action arises out of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and Section 4 and 16 of the Clayton Antitrust Act. 15 U.S.C. §§ 15, 26. This Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the defendants.

17.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Minnesota's long-arm statute. Minn. Stat. § 543.19. This Court also has personal jurisdiction over each Defendant because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped or delivered substantial quantities of Premium-Branded Eyewear throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in anticompetitive conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18.     Defendants, directly or through their divisions, subsidiaries, agents, or affiliates, engaged in interstate commerce in Minnesota for the sale of Premium-Branded Eyewear, defined *infra*. Defendants, directly or through their divisions, subsidiaries, agents, or affiliates, caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstation commerce within the United States.

19.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and the federal venue statutes, 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transacts business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## PARTIES

20.     Plaintiff Frederick Rozo is a citizen of the State of California and resides in California. Mr. Rozo purchased a pair of Oakley sunglasses at an Oakley Vault store located in Cabazon, California on June 21, 2022. Oakley is wholly owned and controlled by EssilorLuxxotica.  Mr. Rozo has been and continues to be in the market for Premium-Branded Eyewear and is at risk of paying artificially high prices in the absence of an injunction.

21.     Plaintiff brings this action individually and on behalf of all others similarly situated consumers in the United States who have purchased Premium-Branded Eyewear from Defendants.

22.     Defendant EssilorLuxottica S.A. is a joint stock company incorporated under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS.

23.     Defendant Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy, and an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica Group S.p.A. owns Defendant Luxottica U.S. Holdings Corp and online retailer Glasses.com. Luxottica Group S.p.A. also owns Oakley, Inc., Alain Mikli, Arnette, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear and holds exclusive licenses for the eyewear brands of the Fashion Houses. To the extent that several of the Fashion Houses have renewed their licensing agreements since the merger of Luxottica Group S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly.

24.     Defendant Essilor International SAS is upon information and belief a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International SAS owns Defendant Essilor of America Holding Company, Inc. and Costa Del Mar, Inc.

25.     Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

26.     Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050. Luxottica U.S. Holdings Corp. owns Defendant Luxottica of America, Inc.

27.     Defendant Essilor of America Holding Company, Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. Essilor of America Holding Company, Inc. owns Defendant Essilor of America Inc.

28.     Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc. owns eyewear retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, glasses.com, framesdirect.com, and For Eyes). Luxottica of America, Inc. also owns Defendant EyeMed Vision Care, LLC.

29.     Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234. Upon information and belief, Essilor of America Inc. owns Vision Source and Frames for America, Inc.

30.     Defendant EyeMed Vision Care, LLC ("EyeMed") is a Delaware limited liability company with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. EyeMed is a wholly owned by Defendant Luxottica of America, Inc.

31.     Defendants EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., Essilor of America Inc., or collectively referred to as "EssilorLuxottica," wholly own or otherwise have direct control over direct-to-consumer retail outlets including, *inter alia*, Oakley stores, Ray-Ban stores, LensCrafters, Pearle Vision, Sunglass Hut, Target Optical, Frames for America, For Eyes stores, Oliver Peoples stores, Vision Source (together with eyebuydirect.com, framesdirect.com, glasses.com, oakley.com, ray-ban.com, sunglesshut.com, lenscrafters.com, pearlevision.com, targetoptical.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, arnette.com, and visionsource.com) and are thus fully integrated with and consolidated into EssilorLuxottica.

32.     **Co-conspirators**: In the alternative to Plaintiff's monopolization theory, Plaintiff alleges below that Defendants conspired with Fashion Houses and competitors to fix prices through long-term exclusive licensing and anticompetitive sales agreements. Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in

connection with EssilorLuxottica's monopolization of the Premium-Branded Eyewear. Plaintiff reserves the right to name some or all of these entities as Defendants.

33.     **Fashion House Co-Conspirators**: Among these participating non-defendant co-conspirators include, *inter alia*: BBGI US, Inc. (f/k/a Brooks Brothers Group, Inc.), Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Limited, Chanel Ltd, Chanel, Inc., Dolce & Gabbana S.r.l., Dolce & Gabbana USA Inc., Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC ("Fashion House Co-Conspirators").

34.     These co-conspirators agreed to de jure exclusive dealing contracts with EssilorLuxottica and thus expressly entered into anticompetitive agreements maintaining EssilorLuxottica's monopoly control of the Premium-Branded Eyewear market. The Fashion House Co-Conspirators tacitly or explicitly agree to permit EssilorLuxottica to establish retail price floors, far above competitive levels, for the retail sale of the Licensed Fashion House Brands as set by and sold in EssilorLuxottica retail stores.

35.     **Premium-Branded Eyewear Competitor Co-Conspirators**: Other participating non-defendant co-conspirators include, *inter alia*: Kering S.A., Kering Eyewear S.p.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Christian Dior SE, Christian Dior, Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thélios S.p.A., and Thelios USA Inc. ("Premium-Branded Eyewear Competitor Co-Conspirators").

36.     These co-conspirators agreed to unlawful, anticompetitive sales agreements wherein the Premium-Branded Eyewear Competitor Co-Conspirators tacitly or explicitly agreed to permit EssilorLuxottica to establish retail price floors, far above competitive levels, for the retail sale of their branded eyewear as set by and sold in EssilorLuxottica retail stores.

37.     **Third Party Seller Co-Conspirators**: Other participating non-defendant co-conspirators include third-party seller that, under their distribution agreements with EssilorLuxottica, tacitly or explicitly agree to permit EssilorLuxottica to establish retail price floors, far above competitive levels, for the retail sale of EssilorLuxottica's Proprietary Brands and Licensed Fashion House Brands as set by and sold in EssilorLuxottica retail stores ("Third Party Seller Co-Conspirators"). On information and belief, Third Party Seller Co-Conspirators include, *inter alia*, Macy's.

38.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiff, are co-conspirators with EssilorLuxottica in its unlawful conduct.

## RELEVANT MARKET

39.     **Premium-Branded Eyewear.** The relevant product market is the market for high-end, designer brand prescription and non-prescription eyeglasses and sunglasses. This market does not include corrective lenses, contact lenses, or non-premium-branded mass consumer eyewear (prescription and non-prescription eyeglasses and sunglasses). The relevant geographic market is the United States.

40.     The Premium-Branded Eyewear market has a number of characteristics that distinguish it from the non-premium-branded mass consumer eyewear market. Premium-Branded Eyewear itself is known for its perceived disassociation from mass consumerism.[2] High-end, designer branded eyewear, in other words, is thought of as "the original anti-fast-fashion stronghold resisting gimmick marketing and mass production."[3] As explained by EssilorLuxottica, Premium-Branded Eyewear, unlike mass-consumer eyewear, is marketed and sold as "desirable fashion accessories that enable self-expression and enhance self-confidence[]," wherein "buying

---

[2] *3 Great Reasons Why Luxury Eyewear is Worth it*, VILLA EYEWEAR (Mar. 23, 2023), https://villaeyewear.com/blog/3-great-reasons-why-luxury-eyewear-is-worth-it/.

[3] Stephan Rabimov, *The Eyewear Renaissance: Global Trends in Luxury Glasses and Sunglasses*, FORBES (Jan. 29, 2023, 03:28PM EST), https://www.forbes.com/sites/stephanrabimov/2023/01/29/the-eyewear-renaissance-global-trends-in-luxury-glasses-and-sunglasses/?sh=7d417cb36b74.

eyeglasses is shift[ed] from a purely functional purchase to a more emotional one."[4] According to EssilorLuxottica, disposable income and higher standards of living have created an "appetite and demand" for Premium-Branded Eyewear.[5]

41.     Conversely, unlike EssilorLuxottica, National Vision Holdings, Inc. ("NVH"), for example, owner of America's Best and Eyeglass World, compete within the "value segment of the U.S. optical retail industry" and cater to the "more cost-conscious customer base."[6] NVH, and others like Warby Parker,[7] offer eyewear products with price points typically around $100 or less because their mass-consumer eyewear products are marketed for their functionality.[8]

42.     Because of these characteristics, in a competitive market, Premium-Branded Eyewear manufacturers look to each other in retail price setting, rather than manufacturers of mass consumer eyewear such as Warby Parker, America's Best, or Eyeglass World, and other brands sold through mass retail chains such as Wal-Mart and Costco. Retail prices for Premium-Branded Eyewear typically begin at or around $250 but may reach $1,000 or more per pair. Indeed, disparity in retail price between Premium-Branded Eyewear, which is often several hundreds of dollars or

---

[4] *2022 Universal Registration Document*, ESSILORLUXOTTICA, 18 (Mar. 10, 2023), https://www.essilorluxottica.com/en/cap/content/101986/ (hereinafter "EL 2022 URD").
[5] *Id.*
[6] *National Vision Holdings, Inc.*, 10-K, 8 (Mar. 8, 2018), https://nationalvision.gcs-web.com/static-files/6754a3f1-b9cf-4bc9-8b04-f232bc04beb9.
[7] Warby Parker has consciously positioned itself as a "disruptor" of the eyewear industry, with its *raison d'etre* being the provision of "stylish" or "designer-style" eyewear at mass market (or close to mass market) prices. *See, e.g.*, *How a Lost Pair of Glasses and a Friendship Disrupted the Eyewear Industry*, CNBC (updated Dec. 12, 2019, 3:43PM EST), https://www.cnbc.com/2019/12/12/warby-parker-how-a-lost-pair-of-glasses-disrupted-the-eyewear-industry.html. Warby Parker's pricing, with glasses as low as $95, *See, e.g.*, *Chamberlain*, WARBYPARKER.COM, https://www.warbyparker.com/eyeglasses/chamberlain/whiskey-tortoise (last accessed Dec. 14, 2023), and its mass-consumer marketing strategy, *see, e.g.*, *Warby Parker—an Advertising and Marketing Strategy Case Study*, G&CO. (Oct. 20, 2023), https://www.g-co.agency/insights/warby-parker-advertising-and-marketing-strategy-case-study (finding, *inter alia*, that Warby Parker excelled among direct-to-consumer brands for its television advertising ($10 million in the first quarter of 2020) and that in 2015 Warby Parker spent $492,000 on paid search keyword rankings between January and June alone) demonstrate that Warby Parker does not meaningfully compete in the Premium-Branded Eyewear market.
[8] *See supra* note 6 at 8.

more, is far higher than mass consumer eyewear, which typically retails at around $100 or under. Because Premium-Branded Eyewear is divorced from mass consumerism, purchasers of Premium-Branded Eyewear would not switch to non-premium-branded mass consumer eyewear based on increases in the price of Premium-Branded Eyewear.

43.     The Premium-Branded Eyewear Market may generate $8.5 billion in 2023.[9]

## MONOPOLY POWER

44.     EssilorLuxottica possesses, and possessed during the relevant time, monopoly power in the Premium-Branded Eyewear Market. EssilorLuxottica dominates the Premium-Branded Eyewear Market, making it unlikely any new entrant could gain meaningful share.

45.     There is substantial direct evidence that EssilorLuxottica possesses monopoly power including, but not limited to, the fact that EssilorLuxottica sets retail prices of Premium-Branded Eyewear far above marginal cost and demonstrates direct ability to control prices in the relevant market.

46.     EssilorLuxottica has the ability to set retail prices substantially higher than its limited competitors in the relevant market without losing customers.

47.     EssilorLuxottica is the world's largest eyewear group. In 2022, EssilorLuxottica reported €24.5 billion (euro), or approximately $26.23 billion USD, in revenue,[10] approximately 47 percent of which—€11.492 billion (euro), or approximately $12.785 billion USD— originated from the North American market.[11] As of 2022, EssilorLuxottica operates in over 150 countries,[12] and has nearly 18,000 stores worldwide with over 3,800 stores in North America alone.[13] EssilorLuxottica's distribution apparatus includes at least over 200,000 wholesale doors (which is

---

[9] STATISTA, https://www.statista.com/outlook/cmo/luxury-goods/luxury-eyewear/worldwide (setting "Global Comparison" to 2022).
[10] EL 2022 URD *supra* note 4 at 6, 7, 84, 85.
[11] *See id.* at 85.
[12] *Id.* at 6.
[13] *Id.* at 11.

more than double its nearest distribution competitor).[14] As Chairman and Chief Executive Officer Francesco Milleri explained during EssilorLuxottica's Capital Market Day 2022:

> [EssilorLuxottica] [is] not just selling frames or lenses or machines or services, we are supplying most of the players in the market. And we don't supply just finished goods, we supply acetate, we supply lenses, when you buy Maui Jim's spectacular frames and lenses you buy Barberini, fully owned by [EssilorLuxottica]. And also the brands the luxury brands in the market, are using, as a key supplier, one of our companies, Fedon, and I can make hundreds of examples.

> So, you see that the value added of the market is created through the full interconnection from [EssilorLuxottica] to all players. And just to say that we are the biggest customers of Gucci or Thélios or Marcolin or whatever . . .

> Now we ask if what we are doing will be good for the entire market. **_We are, in many parts of the world, a proxy for the market._**[15]

48.    EssilorLuxottica is the Premium-Branded Eyewear Market, and its admitted monopolization of the Premium-Branded Eyewear Market is widely known. Even before Luxottica's 2018 merger with Essilor, Luxottica dominated the consumer retail space within the Premium-Branded Eyewear Market. In 2012, when it only had approximately 7,000 retail stores,[16] columnist Brett Arends described Luxottica as "a price maker which means that essentially [Luxottica] can set prices[.]"[17]Even then, Premium-Branded Eyewear Competitors understood the chokehold Luxottica had on the Premium-Branded Eyewear Market. As one Premium-Branded Eyewear competitor told CBS reporter Lesley Stahl during a _60 Minute_ interview: "[I]f you make

---

[14] Robin Mellery-Pratt, _A Closer Look at the $13 Billion Premium Eyewear Market_, BUSINESS OF FASHION (May 15, 2015), https://www.businessoffashion.com/articles/news-analysis/a-closer-look-at-the-13-billion-premium-eyewear-market/.

[15] Statement by EL Chairman and Chief Executive Officer Francesco Milleri, _EssilorLuxottica Capital Market Day 2022 Transcript_, 2 (Sept. 13, 2022), https://www.essilorluxottica.com/en/cap/content/101976/ (emphasis added).

[16] Transcript _Sticker Shock: Why are Glasses so Expensive_, CBS NEWS: 60 MINUTES (June 15, 2014, 7:08PM), https://www.cbsnews.com/news/luxottica-eyewear-why-are-glasses-expensive/ (originally aired on CBS, Oct. 7, 2012).

[17] _Id._

glasses, you want to be in [Luxottica's] stores; and if you have stores, you want to sell Ray-Bans! So Luxottica can set the prices as high as it wants."[18]

49.     The United States Premium-Branded Eyewear Market has generated approximately $7.9 billion revenue in 2022,[19] of which EssilorLuxottica captured 80 percent, or approximately $6.3 billion.[20] As shown in the graphic below, Safilo Group S.p.A is the second largest competitor with an estimated 10 percent market share of revenue in the Premium-Branded Eyewear Market.



---

[18] *Id.*
[19] *Supra* note 9 (setting "Global Comparison" to 2022).
[20] *Id.*; *see also* Ana Swanson, *Meet the Four-Eyed Eight-Tentacled Monopoly that is Making Your Glasses so Expensive*, FORBES (Sept. 10, 2014, 10:25AM EDT), https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=235c0c746b66 ("Luxottica controls 80% of the major brands . . .").

50.     The list of Premium-Branded Eyewear associated with EssilorLuxottica, as shown below,[21] exhibits the breadth of EssilorLuxottica's reach into the Premium-Branded Eyewear Market.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

---

[21] *Eyewear*, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/brands/eyewear/ (last accessed Dec. 14, 2023).

| | | | |
|---|---|---|---|
| alain mikli paris | A\|X ARMANI EXCHANGE | ARNETTE | BOLON |
| Brooks Brothers | BRUNELLO CUCINELLI | BVLGARI | BURBERRY LONDON ENGLAND |
| CHANEL | CHAPS EST. 1978 | COACH NEW YORK | COSTA SEE WHAT'S OUT THERE |
| DbyD | DOLCE & GABBANA | EMPORIO ARMANI | |
| FOSTER GRANT | GIORGIO ARMANI | LUXOTTICA | MK |
| miu miu EYEWEAR | MOLSION | NATIVE EYEWEAR | OAKLEY |
| OLIVER PEOPLES LOS ANGELES | Persol | POLO RALPH LAUREN | PRADA EYEWEAR |
| PRADA | RALPH RALPH LAUREN EYEWEAR | RALPH LAUREN | Ray-Ban |
| Seen | Sferoflex | STARCK BIOTECH PARIS | SWAROVSKI |
| TIFFANY & CO. | TORY BURCH | UNOFFICIAL | VERSACE |
| vogue eyewear | FEDON | | |

51.     EssilorLuxottica's owns, *inter alia*, Sferoflex, Vogue Eyewear, Persol, Arnette, Ray-Ban, Oakley, Oliver Peoples, Alain Mikli, Starck Biotech Paris, Costa Del Mar, and Barberini (the "Proprietary Brands") and has the exclusive rights to, *inter alia*, Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana,

17

Emporio Armani, Giorgi Armani, Michael Kors, Miu, Native, Polo by Ralph Lauren, Prada, Ralph Lauren, Swarovski, Tiffany & Co., Tory Burch, and Versace (the "Licensed Fashion House Brands").

52.     EssilorLuxottica's direct to consumer retail network is equally impressive. Today, as a result of its aggressive retail acquisitions, which includes the largest eyewear retailers in the United States, EssilorLuxottica has nearly 18,000 brick-and-mortar retail stores in over 150 countries with over 3,800 stores in North America alone.[22] EssilorLuxottica's dominant position in the Premium-Branded Eyewear Market is unsurprising because, as known by industry insiders, around 80 percent of the Premium-Branded Eyewear available in EssilorLuxottica's direct-to-consumer stable of retailers, physical and online, are either owned by EssilorLuxottica outright, *i.e.*, the Proprietary Brands, or EssilorLuxottica has the exclusive rights to distribute and sell, *i.e.*, the Licensed Fashion House Brands.[23]

53.     Because it dominates the Premium-Branded Eyewear Market, EssilorLuxottica is able to charge consumers highly inflated, supra-competitive prices, alleged *infra*, while increasing its margins; a classic sign of reduced competition and monopoly power.[24] For example, in 2012, Luxottica reported an operating margin of 14.2 percent which was a 2 percent increase compared to 2011.[25] In 2023, EssilorLuxottica reported a similar increase in operating margin of 16.8 percent in 2022 or an increase of 70 basis points compared to 2021.[26]

---

[22] EL 2022 URD *supra* note 4 at 11.

[23] *See* Sam Knight, *The Spectacular Power of Big Lens*, THE GUARDIAN (May 10, 2018, 2:13EDT), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica.

[24] David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, THE HILL (Nov. 28, 2017 2:00PM ET), https://thehill.com/opinion/healthcare/362146-get-ready-to-pay-when-one-company-dominates-the-eyeglass-market/ ("Since Luxottica bought Ray-Ban almost 20 years ago, the average selling price has gone up, and so have Luxottica's profit margins.").

[25] *Luxottica Profits, Sales Grow*, https://www.luxottica.com/sites/luxottica.com/files/wwd_0.pdf (last accessed Oct. 3, 2023).

[26] *FY 2022 Results*, ESSILORLUXOTTICA (Feb. 22, 2023), https://www.essilorluxottica.com/en/newsroom/press-releases/fy-2022-results/.

54.     Barriers to enter the Premium-Branded Eyewear Market are high and formidable. First, the Premium-Branded Eyewear industry, as an economy of scale, requires significant capital for resourcing raw materials, and constructing and maintaining manufacturing, distribution, and retail facilities. Additionally, as alleged herein, there is limited access to distribution channels because of EssilorLuxottica's market concentration. Moreover, and just as importantly, brand awareness of Premium-Branded Eyewear takes decades to develop and requires additional marketing capital and resources. It is not enough that new entrant's eyewear serves the intended functionality of holding corrective lenses or lenses that protect against ultraviolet light. Rather, new entrants to the Premium-Branded Eyewear market must build their brand into a "desirable fashion accessor[y] that enable[s] self-expression and enhance self-confidence[]"[27] and disassociate itself from the functionality of mass consumerism. In light of the foregoing, potential market entrants face substantial competitive disadvantages.

## ANTICOMPETITIVE CONDUCT

**I.     EssilorLuxottica Historically Eliminates Competitors Through Successive Vertical and Horizontal Acquisitions.**

55.     In January 2017, Luxottica announced its proposed merger with Essilor which was consummated in 2018. Today, as shown above, EssilorLuxottica's geographic footprint is wide and its grip on the Premium-Branded Eyewear Market tight. Eyewear conglomerate Luxottica was founded by Leonardo Del Vecchio in 1961. Essilor, a French optic lens designer and manufacturer, was founded in 1849. In the last twenty-five years, both companies gobbled up the most conspicuous elements of the eyewear business—the frames, the brands, and the retail outlets.[28] Luxottica's 2018 merger with Essilor was part of Del Vecchio's decades long vision to control every element of the eyewear business.[29]

56.     Luxottica, the Premium-Branded Eyewear arm of EssilorLuxottica, dramatically expanded its presence in the United States in 1981 by acquiring Avant-Garde Optics Inc., one of

---

[27] *See* EL 2022 URD *supra* note 4 at 18.
[28] *Supra* note 23.
[29] *Id.*

the most important eyewear distributors in the United States at the time. After its acquisition of Avant-Garde, Luxottica's almost overnight success in the United States was due, in no small measure, to its efforts in establishing the 'Made in Italy' branded eyewear. By the mid- to late-1980s, Luxottica's market share in the United States jumped from less than two percent to seven percent, enough to lead the then-highly fragmented industry, despite being an Italian company.[30]

57. From the 1990s onward, through aggressive vertical and horizontal takeovers, Luxottica aggressively expanded its direct-to-consumer retail presence and built the Premium-Branded Eyewear Market into the approximate $8 billion industry it is today.

58. Luxottica entered consumer retail in 1995 with its $1.4 billion hostile takeover of U.S. Shoe Corporation, owner of LensCrafters, which was at that time the single biggest eyewear retail chain in the United States[31] having an approximate 5.4 percent market share for *all optical products*[32]. Following Luxottica's purchase of U.S. Shoe Corporation, Del Vecchio broke up U.S. Shoe, spinning off U.S. Shoe's non-eyewear divisions until only LensCrafters was left, which he then stocked almost exclusively with Luxottica frames.[33] At that time, Luxottica's United States Premium-Branded Eyewear market share was 18 percent.[34]

59. Six years later, in 2001, Luxottica purchased Sunglass Hut for $462 million. With Luxottica's assumption of Sunglass Hut's debt of $191 million, the total value of Luxottica's

---

[30] *Luxottica SpA*, ENCYCLOPEDIA.COM (updated Jun. 11, 2018), https://www.encyclopedia.com/social-sciences-and-law/economics-business-and-labor/businesses-and-occupations/luxottica-spa.

[31] *A Fascinating History, An Unstoppable Journey: A Future to be Built Day by Day*, LUXOTTICA, 8, available at: https://www.luxottica.com/sites/luxottica.com/modules/tt_luxhistory/pdf/Luxottica_History_ENG_WEB_10.pdf (hereinafter "Luxottica History"); *Luxottica Equity Report*, LUMOS RESEARCH, 14 (Apr. 6, 2017), https://lumosresearch.files.wordpress.com/2018/02/luxottica-equity-report1.pdf; *Luxottica Group S.p.A.*, Form 20-F, 17 (Apr. 21, 2016), https://www.luxottica.com/sites/luxottica.com/files/20f_2015.pdf (hereinafter "Luxottica 20-F").

[32] John Tagilabue, *Luxottica to Acquire U.S. Shoe for $1.4 Billion*, NEW YORK TIMES (Apr. 18, 1995), https://www.nytimes.com/1995/04/18/business/luxottica-to-acquire-us-shoe-for-1.4-billion.html.

[33] *Supra* note 23.

[34] *Supra* note 32.

acquisition of Sunglass Hut was $653 million.[35] In 2004, Luxottica purchased Cole National Corp., the parent company of Pearle Vision, for $401 million.[36] Luxottica's acquisition of Cole National Corp., the third largest optical retailer in the United States,[37] also included an extensive and long-established retail licensing in Target Optical and Sears Optical.[38] As with its purchase of U.S. Shoe, Luxottica spent little time in removing competing frame suppliers from Pearle Vision.[39]

60.     Luxottica then bolstered its online retail presence (already having SunglassHut.com, launched in 2008, Ray-Ban.com and Oakley.com, both launched in 2009, and Oliverpeoples.com) by acquiring Glasses.com in 2014 for an undisclosed amount.[40]

61.     Although primarily in the optical lens market at the time, before its merger with Luxottica, Essilor also began building its own direct-to-consumer apparatus in the United States. In 2010, Essilor acquired majority stake in FramesDirect.com and in 2013 it acquired EyeBuyDirect.com.[41] These direct-to-consumer retail outlets merged with Luxottica's consumer retail outlets upon the two companies' $49 billion merger in 2018.[42]

62.     EssilorLuxottica's penchant for growing its retail presence did not slow. Recently, in 2021, EssilorLuxottica purchased the giant Dutch eyewear retailer GrandVision NV for a

---

[35] *Luxottica Buys Sunglass Hut*, CNN MONEY (Feb. 22, 2001, 10:03AM ET), https://money.cnn.com/2001/02/22/deals/sunglasshut/; *see also Luxottica Equity Report*, *supra* note 28 at 14 (listing the total value of Luxottica's acquisition of Sunglass Hut, as of 2016, to be $669 million).

[36] *Company News; Luxottica to Buy Parent of Pearle Vision for $401 Million*, NEW YORK TIMES (Jan. 27, 2004), https://www.nytimes.com/2004/01/27/business/company-news-luxottica-to-buy-parent-of-pearle-vision-for-401-million.html.

[37] *Cole National Corporation,* 2002 Annual Report and Form 10-K, 1, 4 (June 10, 2003), https://www.sec.gov/Archives/edgar/vprr/0302/03021665.pdf.

[38] Luxottica 20-F, *supra* note 31 at 17.

[39] *Supra* note 23.

[40] Luxottica History, *supra* note 31 at 13; *see also Luxottica Equity Report*, *supra* note 31 at 14.

[41] *Essilor Acquires Majority Stake in EyeBuyDirect.com*, VISION MONDAY (May 9, 2013, 9:15AM), https://www.visionmonday.com/latest-news/article/essilor-acquires-majority-stake-in-eyebuydirectcom-40717/.

[42] Chad Bray and Elizabeth Paton, *Luxottica, Owner of Ray-Ban, in $49 Billion Merger with Essilor*, NEW YORK TIMES (Jan. 16, 2017), https://www.nytimes.com/2017/01/16/business/dealbook/luxottica-essilor-merger.html.

reported $8.7 billion.[43] EssilorLuxottica's purchase of GrandVision NV gave it control of more than 7,200 additional direct-to-consumer retail outlets, where it already sold its Proprietary Brands and Licensed Fashion House Brands across the globe, and added over one hundred brick-and-mortar For Eyes retail stores, which had been purchased by GrandVision in 2015,[44] in the United States as well as foreyes.com.[45]

63.      Luxottica, however, was not satisfied with dominating Premium-Branded Eyewear retail and has quickly grown its stable of Premium-Branded Eyewear brands through aggressive acquisition and anticompetitive exclusive dealings in order to capture the lion's share of the revenue generated in the Premium-Branded Eyewear Market. After its 1981 acquisition of Sferoflex,[46] Luxottica then acquired Vogue in 1990,[47] Persol in 1995,[48] and Arnette in 1999.[49] Luxottica also acquired Ray-Ban in 1999 for $640 million.[50] As with its prior acquisitions of U.S. Shoe and Cole National Corp., after Luxottica acquired Ray-Ban it withdrew Ray-Ban eyewear from over 13,000 competing retail outlets and hiked the retail price of Ray-Ban branded eyewear.[51] Then, in 2007, Luxottica, in a particularly hostile acquisition, detailed *infra*, purchased Oakley,

---

[43] Albertina Torsoli and Bloomberg, *Ray-Ban Owner will go Ahead with Pre-Pandemic $8.7 Billion GrandVision buy Despite Fight with Seller*, FORTUNE (Jun. 30, 2021, 3:43 AM CT), https://fortune.com/2021/06/30/ray-ban-essilorluxottica-merger-grandvision/.

[44] *Press Release: GrandVision Completes Acquisition of U.S. Based Optical Retail Chain For Eyes*, GRANDVISION (Dec. 1, 2015), https://finance.yahoo.com/news/grandvision-completes-acquisition-u-based-165802284.html.

[45] Matthias Blamont, *EssilorLuxottica Sets Sights on Retail Dominance with $8 Billion GrandVision Deal*, REUTERS (Jul. 31, 2019, 12:55AM), https://www.reuters.com/article/us-essilorluxottica-results-idUSKCN1UQ0JW.

[46] Luxottica 20-F, *supra* note 31 at 17.

[47] Luxottica History, *supra* note 31 at 7.

[48] *Id.*

[49] Luxottica 20-F, *supra* note 31 at 19.

[50] *Company News: Bausch & Lomb Selling Sunglasses Business to Luxottica*, NEW YORK TIMES (Apr. 29, 1999), https://www.nytimes.com/1999/04/29/business/company-news-bausch-lomb-selling-sunglass-business-to-luxottica.html; *see also supra* note 23 (reporting the sale was $645 million).

[51] *See supra* note 23.

including its retail outlets, for $2.1 billion.[52] Through its purchase of Oakley, Luxottica also acquired Oliver Peoples, which was previously acquired by Oakley in 2006.[53]

64.     In 2013, Luxottica acquired Alain Mikli International SA, the French Premium-Branded eyewear company,[54] for approximately $90 million Euro (or $120 million USD).[55]

65.     Essilor also aggressively expanded into consumer retail. In 2013, Essilor acquired Costa Del Mar for approximately $270 million[56] which, following their 2018 merger, became part of the EssilorLuxottica Proprietary Brand holdings.

66.     Currently, EssilorLuxottica together owns numerous Premium-Branded Eyewear brands including, *inter alia*, Sferoflex, Vogue Eyewear, Persol, Arnette, Ray-Ban, Oakley, Oliver Peoples, Alain Mikli, Starck Biotech Paris, Costa Del Mar, and Barberini S.p.A., the global leader in optical sunglass lens manufacturing, acquired by Luxottica in 2018.[57] EssilorLuxottica considers all of its Proprietary Brands to be Premium-Branded eyewear.[58]

## II.     EssilorLuxottica and the Fashion Houses Enter into Long-Term, Exclusive Contracts to Deny Retail Competitor Access to the Fashion Houses.

67.     In addition to EssilorLuxottica's Proprietary Brands, it has numerous anticompetitive exclusive licensing deals with the Fashion Houses for their Premium-Branded Eyewear which include, *inter alia*: Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana Emporio Armani, Ferrari,

---

[52] *Italy's Luxottica Buys Oakley for $2.1 Billion*, CNBC (updated Aug. 5, 2010, 3:03 PM ET), https://www.cnbc.com/id/19322418; *see also Luxottica Equity Report*, *supra* note 31 at 14.
[53] Ronald D. White, *Oakley Buys Luxury Eyewear Maker*, LA TIMES (Feb. 9, 2006, 12:00AM PT), https://www.latimes.com/archives/la-xpm-2006-feb-09-fi-oakley9-story.html.
[54] Luxottica 20-F, *supra* note 31 at 17.
[55] *See CORRECTED-UPDATE 2-Luxottica in deal to buy France's Alain Mikli*, REUTERS (Nov. 9, 2012), https://www.reuters.com/article/luxottica-mikli/corrected-update-2-luxottica-in-deal-to-buy-frances-alain-mikli-idUSL5E8M21DB20121109.
[56] *Essilor Agrees to Acquire Polarized Sun Leader Costa in All Cash Deal*, VISION MONDAY (Nov. 8, 2013, 7:30AM), https://mobile.visionmonday.com/latest-news/article/essilor-agrees-to-acquire-polarized-sun-leader-costa-in-all-cash-deal-1/.
[57] *Luxottica Buys Sun Lens Maker Barberini*, EYECARE BUSINESS (Jun. 25, 2018), https://www.eyecarebusiness.com/news/2018/luxottica-buys-sun-lens-maker-barberini.
[58] EL 2022 URD *supra* note 4 at 34–37.

Giorgi Armani, Jimmy Choo, Michael Kors, Miu, Native, Polo Ralph Lauren, Prada, Ralph Lauren, Swarovski, Tiffany & Co., Tory Burch, and Versace.

68.     Fashion Houses produce and sell eyewear within the Premium-Branded Eyewear market, making them horizontal competitors of one another, as well as horizontal competitors of EssilorLuxottica. At all material times, the Fashion Houses operated or had access to independent facilities for the manufacture of their Premium-Branded Eyewear and each of the Fashion Houses either produced or had the ability to produce their own Premium-Branded Eyewear.

69.     In 1988, Luxottica began entering into exclusive licensing agreements with Fashion Houses for the production, manufacture, and sale, both wholesale and direct to consumer retail. Those initial exclusive agreements include, *inter alia*:[59]

    a.  1988: Giorgio Aramani

    b.  1992: Brooks Brothers

    c.  1997: Bulgari

    d.  1999: Chanel

    e.  2003: Prada

    f.  2003: Versace Group

    g.  2006: Dolce & Gabbana

    h.  2006: Burberry

    i.  2007: Ralph Lauren

    j.  2008: Tiffany

    k.  2009: Tory Burch

    l.  2009: Coach

    m.  2015: Michael Kors

---

[59] Luxottica History, *supra* note 31 at 10.

70.    When Essilor and Luxottica merged in 2018, EssilorLuxottica became the counterparty to the exclusive agreements with the above identified Fashion Houses. In 2022, EssilorLuxottica added Brunello Cucinelli and Swarovski[60] and, in 2023, it added Eastman Kodak Company[61] and Jimmy Choo[62] to its stable of Licensed Fashion House Brands.

71.    EssilorLuxottica's exclusive licensing agreements with the Fashion Houses have been maintained through renewal, which include, *inter alia*:

      a.  2014: Tory Burch (10-yr renewal)[63]

      b.  2015: Burberry (10-yr renewal)[64]

      c.  2015: Dolce & Gabbana (10-yr renewal)[65]

      d.  2015: Michael Kors (10-yr renewal)[66]

      e.  2015: Prada (10-yr renewal)[67]

---

[60] *Swarovski and EssilorLuxottica announce a ten-year licensing agreement,* ESSILORLUXOTTICA (Dec. 6, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/swarovski-and-essilorluxottica-license-agreement/; EL 2022 URD *supra* note 4 at 16, 36.

[61] *EssilorLuxottica and Kodak Announce Perpetual Worldwide Brand License Agreement*, ESSILORLUXOTTICA (Jul. 27, 2023), https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-kodak-agreement/.

[62] *EssilorLuxottica and Jimmy Choo Announce a Ten-Year Licensing Agreement*, ESSILORLUXOTTICA (Jun. 29, 2023), https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-and-jimmy-choo-licensing-agreement/.

[63] *Luxottica and Tory Burch Renew Eyewear License Agreement*, LUXOTTICA (Dec. 19, 2014), https://www.luxottica.com/en/luxottica-and-tory-burch-renew-eyewear-license-agreement. This agreement will be effect until December 31, 2028 but includes an automatic renewal option of an additional five years. EL 2022 URD *supra* note 4 at 82.

[64] Monica, Karski, *Luxottica and Burberry Renew Eyewear License Agreement*, FASHION NETWORK (July 30, 2015), https://ww.fashionnetwork.com/news/luxottica-and-burberry-renew-eyewear-license-agreement,555423.html.

[65] *Luxottica Group and Dolce&Gabbana Renew Eyewear License Agreement*, LUXOTTICA (Dec. 16, 2015), https://www.luxottica.com/en/luxottica-group-and-dolcegabbana-renew-eyewear-license-agreement.

[66] *Luxottica Signs New Eyewear License with Michael Kors*, VISION MONDAY (Apr. 16, 2014), https://www.visionmonday.com/latest-news/article/luxottica-signs-new-eyewear-license-with-michael-kors-1.

[67] Monica Karski, *Luxottica and Prada Renew Eyewear License Agreement*, FASHION NETWORK (May 15, 2015), https://ww.fashionnetwork.com/news/luxottica-and-prada-renew-eyewear-license-agreement,485947.html.

f.   2016: Ralph Lauren (10-yr renewal)[68]

g.   2017: Tiffany (10-yr renewal)[69]

h.   2020: Chanel (5-yr renewal)[70]

i.   2020: Versace Group (10-yr renewal)[71]

j.   2021: Bulgari (3-yr renewal)[72]

k.   2021: Coach (5-yr renewal)[73]

l.   2023: Armani Group (15-yr renewal)[74]


72.   EssilorLuxottica's exclusive licensing agreements with the Fashion Houses are all described as "exclusive, global contracts,"[75] and are multi-year licenses for the "manufacturing and distribution"[76] of the Fashion Houses' high-end, designer brand eyewear, under the brands and trademarks of the Fashion Houses. Significantly, under the exclusive licensing agreements, the Fashion Houses send early sketches of their new collections to EssilorLuxottica, and EssilorLuxottica has the exclusive right to design, produce, and determine the selling price for the

[68] *Luxottica Group and Ralph Lauren Renew Eyewear License Agreement*, LUXOTTICA (Dec. 22, 2016), https://www.luxottica.com/en/luxottica-group-and-ralph-lauren-renew-eyewear-license-agreement-0.

[69] *Tiffany & Co. Strengthens Eyewear Offering with Renewed Luxottica License Agreement*, LUXOTTICA (Dec. 14, 2017), https://www.luxottica.com/en/tiffany-co-strengthens-eyewear-offering-renewed-luxottica-license-agreement.

[70] *Chanel and Luxottica Group Renew Eyewear License Agreement*, LUXOTTICA (Oct. 22, 2019), https://www.luxottica.com/en/chanel-and-luxottica-group-renew-license-agreement.

[71] *Luxottica Group and Versace Renew Eyewear License Agreement*, LUXOTTICA (Apr. 10, 2020), https://www.luxottica.com/en/luxottica-group-and-versace-renew-license-agreement.

[72] *Luxottica Group and Bulgari SpA Renew Eyewear License Agreement*, LUXOTTICA (Jul. 31, 2019), https://www.luxottica.com/en/luxottica-group-and-bulgari-spa-renew-license-agreement.

[73] *EssilorLuxottica and Coach Renew Global License Agreement*, ESSILORLUXOTTICA (June 25, 2021), https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-and-coach-renew-global-license-agreement/.

[74] *EssilorLuxottica and the Armani Group Announce 15-Year Licensing Renewal*, ESSILORLUXOTTICA (Sept. 13, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/15-year-licensing-renewal-armani/.

[75] EL 2022 URD *supra* note 4 at 36.

[76] *Id.* at 56.

Licensed Fashion House Brands.[77] In exchange for these exclusive licenses, EssilorLuxottica pays, among other monetary contributions, royalties ranging from 6 to 13 percent to the Fashion Houses for the sale of their designer branded eyewear—*i.e.*, the Licensed Fashion House Brands.[78]

73.     EssilorLuxottica's exclusive licensing agreements with the Fashion Houses contain anticompetitive price coordination clauses, through a most-favored nation clause or similar price coordination clause, that establish retail pricing floors on the Licensed Fashion House Brands as determined, controlled, monitored, and enforced by EssilorLuxottica.[79] In its 2006/07 Annual Report, Burberry boasted that "[w]hile executed by [Luxottica], Burberry is *integrally* involved in product design, as well as marketing and distribution strategy."[80] Conspicuously absent from this statement, however, is whether Burberry has any input in pricing decisions for EssilorLuxottica's sale of its branded eyewear. Indeed, EssilorLuxottica boasts about the mitigating impacts these exclusive licensing agreements (around two-thirds of which contain an automatic renewal clause) have on reducing price competition among and between itself and the Fashion House competitors.[81] These clauses result in alignment of prices for Licensed Fashion House Brands to supra-competitive levels as dictated by EssilorLuxottica and benefit both EssilorLuxottica and the Fashion Houses at the expense of consumers.

---

[77] *See* Andrew Goodman, *There's More to Ray-Ban and Oakley Than Meets the Eye*, FORBES (Jul. 16, 2014, 12:42PM EDT), https://www.forbes.com/sites/agoodman/2014/07/16/theres-more-to-ray-ban-and-oakley-than-meets-the-eye/?sh=548550b722cd (explaining that prior to Luxottica's merger with Essilor, these same licensing agreements permitted Luxottica to design, produce, and determine the selling price of Premium-Branded Eyewear brands, including, but not necessarily limited to: "Chanel, Prada, Miu, Dolce & Gabbana, Bulgari, Tiffany & Co., Versace, Burberry, Polo Ralph Lauren, Donna Karan, DKNY, Paul Smith, Brooks Brothers, Stella McCartney, Tory Burch, Coach, Armani and Starck Eyes.").

[78] EL 2022 URD *supra* note 4 at 36.

[79] *Supra* note 77 (explaining that Luxottica determine the selling price of the Licensed Fashion House Brands).

[80] *Annual Report 2006/07*, BURBERRY, 16 (2007), https://www.burberryplc.com/content/dam/burberry/corporate/Investors/Results_Reports/2007/4-annual_report_2006_07/Report_ses-9.1-final_annual_report.pdf/.

[81] *Id.* at 56.

74.     The existence of the exclusive agreements between EssilorLuxottica and the Fashion Houses is and has always been known to the Fashion Houses as is evidenced by the public announcements of those agreements and the renewal thereof.

### III.     EssilorLuxottica and the Premium-Branded Eyewear Competitors Entered into Sales Agreements to Tighten the Monopolization of the Premium-Branded Eyewear Market.

75.     Additionally, EssilorLuxottica maintains sales agreements with Premium-Branded Eyewear Competitors that are horizontal competitors of EssilorLuxottica wherein EssilorLuxottica agrees to sell the brands of Premium-Branded Eyewear Competitors in its various retail outlets.

76.     For example, EssilorLuxottica sells sunglasses in its Sunglass Hut physical and online stores that are owned, licensed, or manufactured by Kering Eyewear S.p.A., Marcolin S.p.A., which itself holds approximately 5 percent share of the Premium-Branded Eyewear Market,[82] Christian Dior SE, LVMH, and Thélios S.p.A.

77.     Brands owned, licensed, or manufactured by Kering Eyewear S.p.A. for sale at Sunglass Hut include, *inter alia*, Balenciaga, Chloe, Gucci, Maui Jim, and Saint Laurent. Brands owned, licensed, or manufactured by Marcolin S.p.A. for sale at Sunglass Hut include, *inter alia*, Tom Ford. Brands owned, licensed, or manufactured by Christian Dior SE for sale at Sunglass Hut include, *inter alia*, Dior. Brands owned, licensed, or manufactured by LVHM and Thélios S.p.A for sale at Sunglass Hut include, *inter alia*, Celine and Fendi.

78.     The sales agreements contain terms in common with the anticompetitive exclusive licensing agreements between EssilorLuxottica and the Fashion Houses, namely, that they are multi-year licenses for the distribution and sale of Premium-Branded Eyewear under which EssilorLuxottica pays the Premium-Branded Eyewear Competitors royalties or a portion of gross sales of their brands sold through EssilorLuxottica's retail channels.

79.     Because Premium-Branded Eyewear Competitors need EssilorLuxottica's distribution and retail channels, EssilorLuxottica has extracted from the Premium-Branded

---

[82] *Supra* note 9 (Market Share).

Eyewear Competitors anticompetitive price coordination clauses. These price coordination clauses either designate EssilorLuxottica with retail pricing authority of the Premium-Branded Eyewear Competitors, in effect establishing retail price floors, or include a most-favored nation clause or similar price coordination clauses, that result in the alignment of prices for Premium-Branded Eyewear Competitors to supra-competitive levels as dictated by EssilorLuxottica for the benefit of EssilorLuxottica and the Premium-Branded Eyewear Competitors at consumers' expense.

### IV.   EssilorLuxottica Imposes Pricing Controls on its Proprietary Brands and Licensed Fashion House Brands Through Distribution Agreements with Third-Party Sellers.

80.   EssilorLuxottica also controls the retail price of its Proprietary Brands and Licensed Fashion House Brands through its distribution agreements with third party sellers. EssilorLuxottica enters into commercial sales or distribution agreements with third party sellers wherein EssilorLuxottica maintains and enforces retail price recommendation or price coordination clauses for all of its Premium-Branded Eyewear products. The pricing clauses contained in EssilorLuxottica's sales and distribution agreements prohibit pricing discounts and pricing promotions as well as restrict price advertising on Proprietary Brands and Licensed Fashion House Brands. Moreover, EssilorLuxottica strictly monitors and enforces its price recommendations by punishing those acting against EssilorLuxottica's pricing determinations by delaying deliveries or withdrawing authorization to sell EssilorLuxottica's products.

81.   Indeed, on July 22, 2021, the French Competition Authority ("FCA") fined Luxottica €125,174,000 for price-fixing predicated, in large part, on Luxottica's the retail pricing clauses, and Luxottica's enforcement thereof, contained in its sales and distribution agreements with third party sellers.[83] Internal documents uncovered by the FCA make it clear that the retail pricing controls contained in Luxottica's sales and distribution agreements for its Proprietary Brands and Licensed Fashion House Brands were not limited to France.[84]

---

[83] French Competition Authority Decision 21-D-20, *in toto* (July 22, 2021) ("FCA 21-D-20") (machine translated by Google).
[84] *See id.* at 79.

82.     The price recommendation clauses, or most-favored nation or other price coordination clauses, and enforcement thereof, contained in EssilorLuxottica's sales and distribution agreements for the retail sale of its Proprietary Brands and Licensed Fashion House Brands results in the establishment of retail price floors and otherwise result in the coordination of retail prices for EssilorLuxottica's eyewear products in the Premium-Branded Eyewear Market far above competitive levels.

### V.     EssilorLuxottica Fiercely Monitors and Enforces the Retail Price of its Propriety Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors.

83.     Every Premium-Branded Eyewear competitor that has challenged EssilorLuxottica has been forced into hostile acquisition or otherwise forced to back down.

84.     Luxottica infamously and ruthlessly made an example of Oakley in the early 2000s. Oakley, at that time the world's hottest sunglasses brand, got into a pricing dispute with Luxottica,[85] which had just purchased Sunglass Hut. In the summer of 2001, Oakley sought to strike a deal with Luxottica, but Luxottica did not budge. In or around November 2001, Luxottica stopped selling Oakley sunglasses at Sunglass Hut, which made up 25 percent of Oakley's business.[86] Luxottica's retribution caused Oakley's stock price plummeted by 37 percent.[87]

85.     Luxottica then began producing and selling Ray-Bans with blue and green lenses that were virtually a carbon-copy of Oakley's trademark "Ice" and "Emerald" colored sunglasses.[88] One former Luxottica executive stated that they "were doing stuff like creating fake Oakleys."[89] Oakley sued, Luxottica denied wrongdoing, and the companies agreed to a settlement.[90]

86.     Following Oakley's run-in with Luxottica, it understood its precarious position compared to Luxottica. In one public filing, Oakley expressed:

---

[85] *Supra* note 16.
[86] *Supra* note 23.
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*

> Our sunglass specialty stores compete primarily with mall-based sunglass specialty retailers, the largest being *Sunglass Hut, which is owned by Luxottica, a competitor that is also our largest single customer*. Luxottica's global wholesale network is in approximately 120 countries and, in the United States, its retail group includes Lenscrafters, Inc. and Pearle Vision, Inc. Luxottica is larger and has greater financial resources than we do.[91]

Oakley had no choice—to survive it had to merge with Luxottica which occurred in 2007 when Luxottica finalized the takeover. As reporter Lesley Stahl put it: "[Oakley] tried to compete and they lost and then [Luxottica] bought them."[92] Or as then Luxottica Chief Executive Officer Andrea Guerra put it: "[Oakley] understood that life was better together."[93]

87.    Prada went through a similar experience in 1999 when it stopped the exclusive licensing contract it had with Luxottica to start its own production and distribution under the name Eyewear International Distribution S.A. ("EID") and positioned itself in direct competition with Luxottica. But the pressure Luxottica placed on Prada was too much, and Prada was forced to close EID and sign a new exclusive licensing agreement with Luxottica in 2003.[94]

88.    Through its domination of the Premium-Branded Eyewear Market and its extensive network of exclusive licensing and sales agreements, EssilorLuxottica continues to control the prices of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors and eliminate retail price competition for the same. Additionally, because competing brands fear being dropped from EssilorLuxottica's retail stores, EssilorLuxottica is further able to sustain its supra-competitive pricing.

---

[91] *Oakley, Inc.*, Form 10-K, 11 (Mar. 9, 2007), https://www.sec.gov/Archives/edgar/data/946356/000095013707003579/a28078e10vk.htm (emphasis supplied).
[92] *Supra* note 16.
[93] *Id.*
[94] *Prada Ends De Rigo Eyewear Venture, Signs 10-Year License with Luxottica*, WWD (Jul. 24, 2003, 12:00AM), https://wwd.com/feature/prada-ends-de-rigo-eyewear-venture-signs-10-year-license-with-luxottica-724476-1909788/.

VI. **EssilorLuxottica Imposes Pricing Controls on its Proprietary Brands, Licensed Brands, and the Brands of Premium-Branded Eyewear Competitors Through its other Direct to Consumer Channels.**

89. EssilorLuxottica's tentacles stretch beyond the manufacturing, distribution, and sale of Premium-Branded Eyewear and into vision insurance (*e.g.*, EyeMed) and optometry (*e.g.*, Vision Source) where it further sustains its supra-competitive pricing Premium-Branded Eyewear by controlling the pricing decisions on its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors via EyeMed and Vision Source.

90. EyeMed, a wholly owned subsidiary of EssilorLuxottica,[95] is the second largest vision benefits company in the United States. EyeMed serves nearly 72 million members.[96] Under the EyeMed umbrella, EssilorLuxottica controls over 83 percent of optometrists.[97] In-network physical and online providers include, *inter alia*, LensCrafters, Pearle Vision, Target Optical, glasses.com, lencrafters.com, ray-ban.com, and targetoptical.com,[98] all of which are wholly owned by EssilorLuxottica.

91. Optometrists participating in EyeMed must remain in "Good Standing" by, in part, "complying with all contractual commitments and policies."[99] One such policy EssilorLuxottica imposes on optometrists within EyeMed is a prohibition on discounts for "high-end brand" frames: "**Designer frames that prohibit discounts.** Many high-end brands have restrictions on which frames can be discounted."[100] "High-end brand" frames are the Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors. EssilorLuxottica is permitted to implement and enforce this retail pricing control of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear

---

[95] EL 2022 URD *supra* note 4 at 262.
[96] *Why EyeMed*, EYEMED.COM, https://www.eyemed.com/en-us/employers/why-eyemed (last accessed Dec. 14, 2023).
[97] *Supra* note 24.
[98] *Find an Eye Doctor*, EYEMEDVISIONCARE.COM,
https://eyedoclocator.eyemedvisioncare.com/member/en (last accessed Dec. 14, 2023).
[99] *EyeMed July 2023 Provider Manual*, 4, available at: https://www.eyemedinfocus.com/wp-content/uploads/2023/05/April-2023-PM-Final-Clean-4.10.23.pdf.
[100] *Id.* at 39 (emphasis in original).

Competitors pursuant to a delegated pricing authority or other price coordination clauses contained in its anticompetitive exclusive licensing and sales agreements. Notably, EssilorLuxottica does not impose this same discount prohibition on other non-premium-branded mass consumer frames.[101]

92.     Vision Source, another wholly owned subsidiary of EssilorLuxottica, is a network of approximately 4,500 independent optometrists and treats approximately 16 million patients annually.[102] Vision Source is also the leading optical retailer in the United States having 2,994 optometric locations and generating $2.675 billion in eyewear sales in 2022 alone.[103] Each of Vision Source's optometric practices, corporate-owned entities, and independent franchises are bound to the retail price controls set by EssilorLuxottica on the sale of any Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors. Upon information and belief, EssilorLuxottica maintains the retail price of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors pursuant to a delegated pricing authority or other price coordination clauses contained in its anticompetitive exclusive licensing and sales agreements.

## VII.   EssilorLuxottica Has a History of Engaging in Anticompetitive Conduct.

93.     Anticompetitive conduct is nothing new to EssilorLuxottica.

94.     On July 22, 2021, the FCA fined Luxottica €125,174,000 for price-fixing and preventing retailers from selling products online. The FCA found that Luxottica had "recommended" retail pricing provisions contained its sales and distribution agreements for the retail sale of its Proprietary Brands and Licensed Fashion House Brands, and that it monitored and enforced the "recommended" prices for its products through restrictions on discounts and

---

[101] *Id.* at 38 ("**Minimum frame inventory.** Each participating location must maintain/display at least 100 prescription frames priced $130 or less, from any manufacturer.").

[102] *Company History & Facts*, VISIONSOURCE.COM, https://visionsource.com/about/history-facts/#:~:text=About%20Our%20Members,16%20million%20patients%20every%20year (last accessed Dec. 14, 2023).

[103] *VM Top 50 U.S. Optical Retailers 2023*, VISION MONDAY, 20 (2023), https://www.visionmonday.com/CMSDocuments/2023/06/vmtop50retailerschart_2023.pdf.

promotional pricing.[104] Luxottica then punished those that acted against its "recommended" retail pricing which, in effect, fixed the price of Luxottica's stable of Premium-Branded Eyewear in French markets.[105] Separately, the FCA also found Luxottica had several licensing and sales agreements that expressly prohibited the sale of its Premium-Branded Eyewear products over the internet in France.[106]

95.     Then, on November 8, 2022, the FCA levied an €81,067,400 fine on Essilor International SAS, €15,400,000 of which is to be paid jointly and severally with EssilorLuxottica SA, for hindering the development of online sales of corrective lenses in France.[107]

96.     The FCA found that Essilor not only refused to deliver branded lenses to online sellers but also prohibited them from using Essilor's trademarks and logos and from communicating about the origins of the lenses. According to the FCA findings, however, Essilor did not place same restrictions on physical opticians, so long as the physical opticians complied with Essilor's rules. Additionally, the FCA noted that, while opposing online sales of corrective lenses in France, Essilor was marketing this type of lens abroad at the same time, both on its own sites and on third-party sites.[108]

97.     The FCA found that Essilor implemented warranty limitations on online sales operators. Essilor, conditioned its assumption of responsibility for the adaptation warranty on the retailer's compliance with a measurement protocol designed exclusively for in-shop sales. If the retailer did not comply with the in-shop sales protocol, the replacement of lenses was the sole responsibility of the retailer. The FCA found that, in practice, this contract term penalized only

---

[104] *Supra* note 83.

[105] *Id.*

[106] *Id.*

[107] *Optical Lens Sector: the Competition Authority Fines the Company Essilor International SAS and its parent company EssilorLuxottica SA for Discriminatory Commercial Practices to the Tune of 81,067,400 Euros*, COMPETITION AUTHORITY (Nov. 8, 2022), https://www.autoritedelaconcurrence.fr/fr/communiques-de-presse/secteur-des-verres-optiques-lautorite-de-la-concurrence-sanctionne-hauteur-de (translated by Google).

[108] *Id.*

online commerce sites.[109] Resultantly, the FCA found that Essilor's discriminatory trade practices helped it to maintain high and increasing prices of glasses, and that Essilor's practices limited consumer choice.[110]

98.     Indeed, the FCA uncovered internal documents wherein Essilor not only moved forward with its unlawful plan having full knowledge of its illegality under French competition law,[111] but internal documents also illustrated Essilor's plan to monitor pricing and its plan of action should distributors break with it on prices.[112]

## ANTICOMPETITIVE EFFECTS ON CONSUMERS

99.     EssilorLuxottica's above-described anticompetitive acts have had serious anticompetitive effects on competition in the Premium-Branded Eyewear Market and have resulted in Plaintiff and the members of the Class paying supra-competitive prices for EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors.

100.    With functionally no retail price competition from the Fashion Houses, Premium-Branded Eyewear Competitors, and third-party sellers, EssilorLuxottica has been able to coordinate and maintain retail pricing floors for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors at supra-competitive levels. The effect of this coordination is supra-competitive pricing of all Premium-Branded Eyewear in the United States. Even by 2012, there were reports that Luxottica was marking-up the direct-to-consumer retail price on its Proprietary Brands and Licensed Fashion House Brands by as much as 1,000 percent.[113]

---

[109] *Id.*

[110] *Id.*

[111] *See, e.g.*, French Competition Authority Decision 22-D-16 ¶¶ 721–24 (Oct. 6, 2022), https://www.autoritedelaconcurrence.fr/sites/default/files/integral_texts/2022-11/22d16.pdf (untranslated link)

[112] *See, e.g.*, *id.* ¶¶ 156–60, 647 (untranslated link).

[113] *See supra* note 16; *see also supra* note 20 ("The fanciest frames at LensCrafters often sell for $400-500. Holding those little assemblages of glass, metal, and plastic that cost $25-50 to make in your hand[.]").

101.    More recently, however, some estimates show that EssilorLuxottica has marked up the retail price of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors by at least 1,000 percent and far more. The costs to produce and manufacture Premium-Branded Eyewear are remarkably low. E. Dean Butler, the founder of LensCrafters, has explained that "designer-quality frames, like what you'd get from Prada" cost about $15 to produce and manufacture per unit.[114] Yet, EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Competitor Premium-Branded Eyewear retail from approximately $250 up to a $1,000 a pair and even higher. With production costs of $15 to $20 per unit, and assuming that, with the inclusion of distribution costs, and royalties for the Licensed Fashion House Brands and the brands of Premium-Branded Eyewear Competitors, those costs double[115] on a per unit basis, EssilorLuxottica is still able to sustain and enforce markups of approximately 1,000–5,000 percent. LensCrafters founder E. Dean Butler said it best: "It's ridiculous. It's a complete rip off."[116]

102.    EssilorLuxottica, through its exclusive licensing agreements, sales agreements with Premium-Branded Eyewear Competitors, and third-party distribution agreements, is able to sustain these prices, in no small part, because those agreements tacitly or explicitly permit EssilorLuxottica to establish retail price floors through its physical and online retail outlet stores that Premium-Branded Eyewear competitors and third-party sellers cannot undercut. For example, Prada's Linea Rossa sunglasses model PS51XS retails for $349 at EssilorLuxottica's sunglasshut.com and macys.com, but retails at $410 at prada.com. Similarly, Prada's Symbol sunglasses model PR06YS retails for $433 at EssilorLuxottica's sunglasshut.com and macys.com,

---

[114] David Lazarus, *Glasses are Still too Damn Expensive*, LA TIMES (Jan. 11, 2022, 6:00AM PT), https://www.latimes.com/business/story/2022-01-11/column-glasses-still-too-expensive; *see also* Chavie Lieber, *Glasses can Have a Markup of 1,000%. Two Former LensCrafters Executives Revealed Why*, VOX (Mar. 6, 2019, 4:10PM EST), https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica.

[115] Journalist Sam Knight reported that even "top-of-the-range frames and lenses cost, combined, no more than about £30 to produce" (which comes to approximately $37 USD). *Supra* note 23.

[116] Lazarus, *supra* note 114.

but retails at $520 at prada.com. Prada's Lenea Rossa Impavid SPS0YS with white frames and blue tinted lenses retails at $467 at EssilorLuxottica's sunglasshut.com and at macys.com, while retailing for $485 at prada.com. The retail price of all Licensed Fashion House Brands is coordinated and established to be the least expensive at EssilorLuxottica retail outlets, but still well over what they would cost in a competitive market.

103.    EssilorLuxottica is further able to extract this supra-competitive price floor and eliminate price competition from the Fashion Houses and Premium-Branded Eyewear Competitors, because those competitors *need* EssilorLuxottica's retail and wholesale arms to sell their products. As shown above, EssilorLuxottica dominates direct to consumer retailing, having nearly 18,000 physical stores globally and over 3,800 physical stores in the United States and its distribution apparatus includes at least over 200,000 wholesale doors (which is more than double its nearest distribution competitor).[117] As one competitor expressed in 2012: "[I]f you make glasses, you want to be [Luxottica's] stores[.]"[118] And, every time a competitor has attempted to compete with EssilorLuxottica, they have been either acquired, as in the case of Oakley, or they backed down, as in the case of Prada.

104.    The same is true for EssilorLuxottica's Proprietary Brands and Licensed Fashion House Brands that it distributes to third party retailers who agree to adhere to the retail pricing determinations for the re-sale of those Premium Eyewear Products. Indeed, as found by the FCA, prior to its merger with Essilor, Luxottica, in its distribution agreements, had "recommended" retail pricing provisions for the sale of its Proprietary Brands and Licensed Fashion House Brands, and it fiercely monitored and enforced those "recommended" retail selling prices.[119]

---

[117] *Supra* note 14.
[118] *Supra* note 16.
[119] *Supra* note 83.

105.     As E. Dean Butler has stated, the direct-to-consumer retail price of Premium-Branded Eyewear is price gouging[120] and "[i]f that's not a monopoly, I don't know what is."[121]

106.     As shown herein, EssilorLuxottica has already harmed competition by restricting Premium-Branded Eyewear competitors' ability to compete with EssilorLuxottica for the retail price of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors through its web of exclusive agreements, sales agreements, and distribution agreements.

107.     Moreover, through its anticompetitive exclusive licensing agreements, EssilorLuxottica eliminates the Fashion Houses from distributing or otherwise wholesaling their own Premium-Branded Eyewear to third party retailers, who might, in turn, compete with EssilorLuxottica's retail pricing of those products, thereby substantially foreclosing the Premium-Branded Eyewear Market, by a minimum 35 percent, to potential retail competitors.

108.     Consumer choice has been further limited because, although there are many Premium-Branded Eyewear brands, any choice between those brands is an illusion. Stemming from the consolidated artifice created by EssilorLuxottica, the Fashion Houses, and Premium-Branded Eyewear Competitors, consumers' purchase of nearly any Premium-Branded eyewear brand is funneled to EssilorLuxottica.

109.     EssilorLuxottica has unlawfully eliminated competition in the Premium-Branded Eyewear Market and coordinated its efforts to maintain the retail price of Premium-Branded Eyewear at supra-competitive levels.

### THERE IS NO LEGITIMATE PROCOMPETITIVE JUSTIFICATION

110.     Chairman and Chief Executive Officer Francesco Milleri said it best: "Now we ask if what we are doing will be good for the entire market.   *We are*, in many parts of the world, *a*

---

[120] Lieber, *supra* note 114.
[121] David Lazarus, *Column: How Badly are we Being Ripped off on Eyewear? Former Industry Execs Tell all*, L.A. TIMES (Mar. 5, 2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-glasses-lenscrafters-luxottica-monopoly-20190305-story.html.

*proxy for the market*."[122] But EssilorLuxottica is not a natural monopoly but became one by concerted and intentional design.

111.    EssilorLuxottica's exclusive agreements with the Fashion Houses, sales agreements with Premium-Branded Eyewear Competitors, distribution agreements with third party sellers, and the other anticompetitive conduct alleged herein do not serve any legitimate procompetitive business purpose as they were part of a long-held scheme to monopolize the Premium-Branded Eyewear Market with the intent to grossly inflate the price of EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors far above competitive levels.

112.    EssilorLuxottica's conduct was not reasonably necessary to reduce prices and in fact did not, and does not, reduce prices from those that would exist with free competition. Moreover, even if EssilorLuxottica's conduct did provide lower competitive prices—which it does not—EssilorLuxottica could have accomplished the same objective through less restrictive alternatives such as eliminating the exclusivity of its licensing with the Fashion Houses and eliminating the tacit or explicit direct-to-consumer retail level price floors, or other price coordination clauses, contained in EssilorLuxottica's exclusive agreements, sales agreements, and distribution agreements with eyewear and retail competitors.

**FRAUDULENT CONCEALMENT TOLLING THE STATUTE OF LIMITATIONS**

113.    Plaintiff and members of the Class had no knowledge of Defendants', Fashion House Co-Conspirators', Competitor Premium Brand Co-Conspirators', and Sellers Co-Conspirators' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this Complaint.

114.    This is the case because the nature of Defendants' conspiracy was self-concealing and because Defendants employed deceptive practices and techniques of secrecy to avoid detection

---

[122] *Supra* note 15 (emphasis supplied).

of, and to fraudulently conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, among other things, concealing from Plaintiff and the public the nature of the exclusive agreements, sales agreements, and distribution agreements between EssilorLuxottica and the Fashion Houses, Competitor Premium-Branded Eyewear, and third-party sellers, respectively.

115.    Further, Luxottica has a documented history of concealing unlawful conduct. During its investigation of Luxottica, the FCA uncovered an internal email written by the Commercial Director of Luxottica France directing an individual named Philippe to "contact the optician on this point ONLY BY TELEPHONE[,]" and then to "PLEASE DELETE ALL YOUR EMAILS ON THIS SUBJECT IMMEDIATELY."[123]

116.    As a result of Defendants' fraudulent concealment, all applicable statute of limitations affecting the Plaintiff's and the Class's claims have been tolled.

### ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

117.    During the relevant period, Plaintiff and the Class paid substantial overcharges on EssilorLuxottica's Proprietary Brands, the Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors. As a result of the illegal conduct alleged in this complaint, Plaintiff and members of the Class were compelled to pay, and did pay, artificially inflated prices for EssilorLuxottica's Proprietary Brands, the Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors.

118.    Plaintiff and the members of the Class paid the overcharge directly to EssilorLuxottica by their purchasing of EssilorLuxottica's Proprietary Brands, the Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors at direct to consumer retail outlets wholly owned by EssilorLuxottica, which include, *inter alia*, Oakley stores,

---

[123] FCA 21-D-20 *supra* note 83 at 79, 130 (emphasis in original) (machine translated by Google).

Ray-Ban stores, LensCrafters, Pearle Vision, Sunglass Hut, Target Optical, For Eyes stores, Oliver Peoples stores, Persol stores, Alain Mikli stores, Vision Source optometric offices, eyebuydirect.com, framesdirect.com, glasses.com, oakley.com, ray-ban.com, sunglesshut.com, lenscrafters.com, pearlevision.com, targetoptical.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, or arnette.com.

119.    Consequently, Plaintiff and the Class have sustained substantial losses and damage to their property in the form of overcharges. The full amount, form, and components of such damages will be calculated after discovery and proof at trial.

120.    Defendants' efforts to monopolize and restrain competition in the Premium-Branded Eyewear Market have substantially affected interstate and foreign commerce.

121.    At all material times, EssilorLuxottica sold its Proprietary Brands, the Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in a continuous and uninterrupted flow of commerce across state, national lines, and throughout the United States.

122.    At all material times, EssilorLuxottica shipped, transported, or otherwise distributed EssilorLuxottica's Proprietary Brands, the Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in a continuous and uninterrupted flow of commerce across state and national lines in connection with Defendants' direct to consumer sale of the same.

## CLASS ALLEGATIONS

123.    Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class which is defined as follows:

> All persons in the United States who have purchased any of EssilorLuxottica's Proprietary Brands, Fashion House Licensed Brands, and the brands of Premium-Branded Eyewear Competitors, as those brands are defined in this complaint, directly from EssilorLuxottica-owned or operated physical or online retail outlets including, but not limited to, Oakley stores, Ray-Ban stores, LensCrafters, Pearle Vision, Sunglass Hut, Target Optical, For Eyes stores, Oliver Peoples stores, Persol stores, Alain

Mikli stores, Vision Source optometric offices, eyebuydirect.com, framesdirect.com, glasses.com, oakley.com, ray-ban.com, sunglesshut.com, lenscrafters.com, pearlevision.com, targetoptical.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, or arnette.com from January 1, 2010 through and until the date of trial.

124.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands, if not hundreds of thousands, or more, of Class members.

125.    Plaintiff's claims are typical of those of the Class.

126.    Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for EssilorLuxottica Proprietary Brands, Fashion House Licensed Brands, and the brands of Premium-Branded Eyewear Competitors than they otherwise would have in a competitive market.

127.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are not antagonistic to those of the Class.

128.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members since the Defendants have acted and refused to act on grounds generally applicable to the Class.

129.    Questions of law and fact common to the Class include:

    a.    Whether the United States Premium-Branded Eyewear market constitutes a Relevant Market;

    b.    Whether EssilorLuxottica possesses monopoly power in the Relevant Market;

    c.    Whether EssilorLuxottica monopolized, conspired to monopolize, or attempted to monopolize the Premium-Branded Eyewear Market in the United States in violation of Section 2 of the Sherman Act;

    d.    Whether EssilorLuxottica' exclusive dealing contracts constitute anticompetitive acts intended to maintain EssilorLuxottica's monopoly in the Premium-Branded Eyewear Market in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

    e.    Whether EssilorLuxottica's exclusive dealing contracts, sales agreements, and distribution agreements constitute a conspiracy

to monopolize the Premium-Branded Eyewear Market in violation of Section 2 of the Sherman Act;

f.  Whether EssilorLuxottica's exclusive dealing contracts and sales agreements constitute a conspiracy, combination, or collusion to fix, raise, maintain, or stabilize the retail price of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium- Branded Eyewear Competitors or otherwise restrain trade in the United States in violation of Section 1 of the Sherman Act;

g.  Whether the conduct of EssilorLuxottica, as alleged in this Complaint, caused Plaintiff and the Class to pay supra-competitive prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors, and, thereby, suffer antitrust injuries;

h.  The appropriate declaratory and injunctive relief for the Class; and

i.  The measure of damages sustained by Plaintiff and the Class.

130.  Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

131.  Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise managing this class action.

## CAUSES OF ACTION

### COUNT ONE
**Monopolization**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

132.  Plaintiff incorporates and realleges all previous allegations as if fully set forth herein.

133.     EssilorLuxottica, as alleged herein, has monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition. No other competitor has been able to restrain EssilorLuxottica's ability to charge supra-competitive monopoly prices for Premium-Branded Eyewear during the relevant time period. EssilorLuxottica had and has the ability to control prices and exclude competitors.

134.     EssilorLuxottica has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Premium-Branded Eyewear Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. EssilorLuxottica's monopoly power has not been maintained as a result of superior product, business acumen, or historical accident.

135.     EssilorLuxottica has unreasonably restrained, and further threatens to unreasonably restrain competition in the Premium Eyewear Market by:

   a.  entering into long-term, exclusive, anticompetitive agreements with the Fashion Houses that restrain market entry, exclude competitors, control prices, limit output, or any combination of such restraints.

   b.  entering into sales agreements with Premium-Branded Eyewear Competitors that exclude retail competition, control prices, limit output, or any combination of such restraints.

   c.  entering into distribution agreements with third party sellers for the sale of Proprietary Brands and Licensed Fashion House Brands that exclude retail competition, control prices, limit output, or any combination of such restraints, for the sale of the same products.

   d.  establishing discount prohibitions and pricing restrictions on EssilorLuxottica Proprietary Brand, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors through EssilorLuxottica wholly owned subsidiaries including, *inter alia*, EyeMed and Vision Source.

   e.  aggressively eliminating Premium Eyewear competitors through vertical and horizontal anticompetitive acquisitions.

136.     While these anticompetitive acts also constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

137.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

138.    As a direct and proximate result of EssilorLuxottica's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) EssilorLuxottica's ability to charge artificially high, supra-competitive retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors; (ii) EssilorLuxottica's ability to control and set minimum retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in the Premium Eyewear Market; and (iii) EssilorLuxottica's ability to control and reduce availability, *i.e.*, output, of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors to consumers in the Premium Eyewear Market. Plaintiff and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors than they would have paid or would pay in the future in the absence of EssilorLuxottica's aforementioned unlawful conduct.

## COUNT TWO
### Exclusive Dealing
(Violations of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and
Section 3 of the Clayton Act, 15 U.S.C. § 14)

139.    Plaintiff incorporates and realleges all previous allegations as if fully set forth herein.

140.    As detailed above, EssilorLuxottica has monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition.

141.    EssilorLuxottica has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with the Fashion Houses, creating high barriers to entry and unreasonably excluding competitors in the Premium Eyewear Market.

142.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

143.    EssilorLuxottica's web of exclusive dealing agreements cannot be justified by any purportedly pro-competitive purpose, such as to ensure a reliable supply of Premium Eyewear, because the exclusive dealing arrangements also give EssilorLuxottica the exclusive right to distribute, *i.e.*, wholesale, the Licensed Fashion House Brands and set minimum retail pricing floors, or otherwise control or coordinate the retail price, on those same products. Thus, EssilorLuxottica's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of controlling, or excluding, retail competitors from the Premium Eyewear Market.

144.    EssilorLuxottica's conduct has substantially foreclosed competition in the Premium Eyewear Market.

145.    Because this conduct involves exclusionary agreements between two or more unaffiliated entities, EssilorLuxottica's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1. EssilorLuxottica's exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anticompetitive acts intended to maintain EssilorLuxottica's monopoly in the Premium Eyewear Market. EssilorLuxottica's exclusionary agreements are for the sale of goods and thus violate Section 3 of the Clayton Act, 15 U.S.C. § 14 on the grounds alleged herein.

146.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

147.    As a direct and proximate result of EssilorLuxottica's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) EssilorLuxottica's ability to charge artificially high, supra-competitive retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors; (ii) EssilorLuxottica's ability to control and set minimum retail prices for

its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in the Premium Eyewear Market; and (iii) EssilorLuxottica's ability to control and reduce availability, *i.e.*, output, of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors to consumers in the Premium Eyewear Market. Plaintiff and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT THREE
### Conspiracy to Monopolize
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

148.  Plaintiff incorporates and realleges all previous allegations as if fully set forth herein.

149.  Through its exclusive licensing agreements, sales agreements, and distribution agreements EssilorLuxottica, the Fashion House Co-Conspirators, Premium-Branded Eyewear Competitor Co-Conspirators, and Third Party Seller Co-Conspirators combined or conspired to create or maintain or attempt to create or maintain EssilorLuxottica's monopoly power in the Premium Eyewear Market. The exclusive licensing agreements, sales agreements, and distribution agreements incorporate price coordination clauses that prevent the Fashion Houses, Premium-Branded Eyewear Competitors, and third-party sellers from competing with EssilorLuxottica's retail price for Premium-Branded Eyewear by establishing pricing floors, or otherwise controlling or coordinating the retail price of the same, as set by and sold in EssilorLuxottica's physical and digital retail outlets. The exclusive licensing agreements, sales agreements, and distribution agreements facilitate EssilorLuxottica's monopoly power both by raising the consumer retail price of Premium-Branded Eyewear sold by EssilorLuxottica's competitors and by suppressing competition for Premium-Branded Eyewear by eliminating the benefit of lowering consumer retail price at retail outlets unaffiliated with EssilorLuxottica.

150.     EssilorLuxottica has taken steps in furtherance of the conspiracy by entering into its exclusive licensing agreements, sales agreements, and distribution agreements and enforcing the pricing controls contained therein by penalizing competitors, eyewear and retail, that rebuff EssilorLuxottica's pricing decisions.

151.     The purpose and effect of the exclusive licensing agreements, sales agreements, and distribution agreements is to prevent price competition with EssilorLuxottica for Premium-Branded Eyewear and thereby artificially increase the retail price of EssilorLuxottica's Proprietary Brands, the Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors. Because EssilorLuxottica, the Fashion Houses, Competitor Premium-Branded Eyewear Brands, and third-party retailers agree to restrain competition with EssilorLuxottica, all share a specific intent to establish or maintain EssilorLuxottica's monopoly power.

152.     EssilorLuxottica possesses monopoly power in the Premium-Branded Eyewear Market, as demonstrated by its market share and ability to raise prices far above those that would be charged in a competitive market. EssilorLuxottica, through anticompetitive means as alleged herein, has gained the ability to exercise and maintain market power.

153.     EssilorLuxottica, with its co-conspirators, has willfully acquired or attempted to acquire monopoly power in the Premium-Branded Eyewear Market by unlawful and improper means, including through its enforcement of retail pricing controls for Premium-Branded Eyewear sold at EssilorLuxottica owned retail outlets. By agreeing to apply a price floor, or otherwise agree to the pricing restrictions as determined by EssilorLuxottica, on their sale of Premium-Branded Eyewear at their own retail outlets, EssilorLuxottica and its co-conspirators immunize the Proprietary Brands, Licensed Fashion House brands, and the brands of Premium-Branded Eyewear Competitors from competitive pricing in the Premium-Branded Eyewear Market and causes Premium-Branded Eyewear products to be sold as artificially high, supra-competitive prices.

154.     The existence of EssilorLuxottica's exclusive agreements, sales agreements, and distribution agreements is and has always been known to Defendants and co-conspirators.

155.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

156.    By engaging in the foregoing conduct, EssilorLuxottica and its co-conspirators have intentionally and wrongfully conspired to monopolize in violation of the Sherman Act.

157.    As a direct and proximate result of EssilorLuxottica's conspiracy to monopolize, Plaintiff and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Licensed Fashion House brands, and the brands of Premium-Branded Eyewear Competitors than they would have paid or would pay in the future in the absence of EssilorLuxottica's conspiracy to monopolize.

**COUNT FOUR**
**Attempted Monopolization**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

158.    Plaintiff incorporates and realleges all previous allegations as if fully set forth herein.

159.    As detailed above, EssilorLuxottica has monopoly power. In the alternative, and at a minimum, it possesses a dangerous probability of success in acquiring monopoly power in the Premium-Branded Eyewear Market, including the power to control prices and exclude competition.

160.    EssilorLuxottica has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Premium-Branded Eyewear Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

161.    EssilorLuxottica's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and preventing competition in the Premium Eyewear Market. EssilorLuxottica's ongoing anticompetitive conduct presents a dangerous probability that EssilorLuxottica will succeed, to the extent that it has not already, in its attempt to monopolize the Premium-Branded Eyewear Market.

162.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

163.    As a direct and proximate result of EssilorLuxottica's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) EssilorLuxottica's ability to charge artificially high, supra-competitive retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors; (ii) EssilorLuxottica's ability to control and set minimum retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in the Premium Eyewear Market; and (iii) EssilorLuxottica's ability to control and reduce availability, *i.e.*, output, of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors to consumers in the Premium Eyewear Market. Plaintiff and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT FIVE
### Agreements to Restrain Trade
(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

164.    Plaintiff incorporates and realleges all previous allegations as if fully set forth herein.

165.    In the alternative to the monopolization theories set forth in this complaint, EssilorLuxottica has formed a cartel with the Fashion House Co-Conspirators and Premium-Branded Eyewear Competitor Co-Conspirators to artificially inflate the price of its Proprietary Brands, Fashion House Licensed Brands, and the brands of Premium-Branded Eyewear Competitors above competitive levels.

166.    Under the exclusive licensing agreements, the Fashion Houses send early sketches of their new collections to EssilorLuxottica, and EssilorLuxottica has the exclusive right to design, produce, and determine the selling price for the Licensed Fashion House Brands. EssilorLuxottica's exclusive licensing agreements with the Fashion Houses contain anticompetitive price coordination clauses that either designate EssilorLuxottica with retail pricing authority of the Licensed Fashion House Brands, in effect establishing retail price floors, or include a most-favored nation clause or similar price coordination clauses, that result in alignment of prices for Fashion House Licensed Brands to supra-competitive levels as dictated by EssilorLuxottica and for the benefit of both EssilorLuxottica and the Fashion Houses at the expense of consumers.

167.    The sales agreements contain terms in common with the anticompetitive exclusive licensing agreements between EssilorLuxottica and the Fashion Houses. EssilorLuxottica has extracted from the Premium-Branded Eyewear Competitors anticompetitive price coordination clauses. These price coordination clauses either designate EssilorLuxottica with retail pricing authority of the Premium-Branded Eyewear Competitors, in effect establishing retail price floors, or include a most-favored nation clause or similar price coordination clauses, that result in the alignment of prices for the brands of Premium-Branded Eyewear Competitors to supra-competitive levels as dictated by EssilorLuxottica and for the benefit of EssilorLuxottica and the Premium-Branded Eyewear Competitors.

168.    The existence of EssilorLuxottica's exclusive agreements and sales agreements is and has always been known to Defendants, the Fashion Houses, and the Premium-Branded Eyewear Competitors.

169.    There are no procompetitive justifications for EssilorLuxottica's cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

170.    As a direct and proximate result of EssilorLuxottica's cartel, Plaintiff and the Class have been damaged by, among other things: (i) EssilorLuxottica's ability to charge artificially high, supra-competitive retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors; (ii) EssilorLuxottica's ability to

control and set minimum retail prices for its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors in the Premium Eyewear Market; and (iii) EssilorLuxottica's ability to control and reduce availability, *i.e.*, output, of its Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors to consumers in the Premium Eyewear Market. Plaintiff and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

171.   Defendants' cartel is unlawful *per se*. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason.

## PETITION FOR RELIEF

Plaintiff petitions for the following relief:

A.   A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel.

B.   A declaration that EssilorLuxottica has monopolized, conspired to monopolize, or in the alternative, attempted to monopolize, the Premium Eyewear Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

C.   A declaration that EssilorLuxottica's exclusive licensing agreements with the Fashion Houses unreasonable and unenforceable restraints of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

D.   In the alternative, a declaration that EssilorLuxottica's exclusive licensing agreements and sales agreements with the Fashion Houses and Premium-Branded Eyewear Competitors constitutes an unlawful agreement to restrain trade in violation of Section 2 of the Sherman Act, 15. U.S.C. § 2.

E.   Compensatory and treble damages resulting from EssilorLuxottica's Sherman Act violations.

F.   Permanent injunctive relief invalidating EssilorLuxottica's exclusive licensing agreements with the Fashion Houses.

G.   Permanent injunctive relief invalidating all price coordination or price delegation clauses contained in EssilorLuxottica's sales agreements with Premium-Branded Eyewear Competitors.

H.  Permanent injunctive relief invalidating all price coordination or price delegation clauses contained in EssilorLuxottica's distribution agreements with third party sellers.

I.  Permanent injunctive relief invalidating all discount prohibitions and pricing restrictions on EssilorLuxottica Proprietary Brand, Licensed Fashion House Brands, and the brands of Premium-Branded Eyewear Competitors sold through EssilorLuxottica wholly owned subsidiaries including, *inter alia*, EyeMed and Vision Source.

J.  Plaintiff's and the Class's costs, expenses, and reasonable attorneys' fees.

K.  Such further relief as may be necessary or proper based upon this Court's declaratory judgments pursuant to 28 U.S.C. § 2202.

L.  Such other relief in equity or at law as this Court may deem just and proper.

## REQUEST FOR A JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

[signature follows]

ZELLE LLP

Date: December 15, 2023                    By:    */s/ Lindsey Davis*
                                                    Lindsey Davis (MN Bar #0332148)
                                                    James S. Dugan (*pro hac vice* application to
                                                    be submitted)
                                                    **ZELLE LLP**
                                                    500 Washington Avenue South, Suite 4000
                                                    Minneapolis, MN 55415
                                                    Telephone:  (612) 339-2020
                                                    Facsimile:   (612) 336-9100
                                                    ldavis@zellelaw.com
                                                    jdugan@zellelaw.com

                                                    Christopher T. Micheletti (*pro hac vice*
                                                    application to be submitted)
                                                    Qianwei Fu (*pro hac vice* application to be
                                                    submitted)
                                                    **ZELLE LLP**
                                                    555 12th Street, Suite 1230
                                                    Oakland, CA 94607
                                                    Telephone:  (415) 693-0700
                                                    Facsimile:   (415) 693-0770
                                                    cmicheletti@zellelaw.com
                                                    qfu@zellelaw.com

                                                    ***Attorneys for Plaintiff***